# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――

Argued September 18, 2012        Decided August 30, 2013

No. 11-5282

JUDICIAL WATCH, INC.,
APPELLEE

v.

UNITED STATES SECRET SERVICE,
APPELLANT

―――

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-02312)

―――

*Mark B. Stern*, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *Tony West*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, *Beth S. Brinkmann*, Deputy Assistant Attorney General, and *Michael S. Raab* and *Abby C. Wright*, Attorneys. *Brad P. Rosenberg*, Trial Attorney, entered an appearance.

*James F. Peterson* argued the cause and filed the brief for appellee. *Paul J. Orfanedes* entered an appearance.

*David Murray* was on the brief for *amici curiae* Bloomberg L.P., et al. in support of appellee.

*David L. Sobel*, *Anne L. Weismann*, and *Melanie Sloan* were

on the brief for *amici curiae* Citizens for Responsibility and Ethics in Washington, et al. in support of appellee.

Before: GARLAND, *Chief Judge*, and SENTELLE and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Judicial Watch filed a Freedom of Information Act (FOIA) request with the Secret Service, seeking records of every visitor to the White House Complex over a period of seven months. The Secret Service denied the request, arguing that the requested documents are not "agency records" subject to disclosure under FOIA. The district court rejected that argument and ordered the agency to release the records or assert specific FOIA exemptions on a document-by-document basis. We reverse in part and affirm in part.

In both the 1974 FOIA Amendments and the 1978 Presidential Records Act, Congress made clear that it did not want documents like the appointment calendars of the President and his close advisors to be subject to disclosure under FOIA. Granting Judicial Watch's request for certain visitor records, however, would effectively disclose the contents of those calendars. For the reasons discussed below, we conclude that such records are not "agency records" within the meaning of FOIA.

In addition to the President and his advisors, the White House Complex also houses components that Congress *did* intend to subject to FOIA. We conclude that records of visits to those components are "agency records" subject to disclosure under the Act.

I

In 1951, the year after two men attempted to assassinate President Truman just across the street from the White House, Congress permanently authorized the Secret Service to protect the President and Vice President. *See* Pub. L. No. 82-79, § 4, 65 Stat. 121, 122 (1951) (codified at 18 U.S.C. § 3056(a)). Upon signing the legislation, Truman reportedly remarked: "Well, it is wonderful to know that the work of protecting me has at last become legal." PHILIP H. MELANSON, THE SECRET SERVICE: THE HIDDEN HISTORY OF AN ENIGMATIC AGENCY 54 (2002).[1] In 1984, three years after an attempt on the life of President Reagan, Congress made acceptance of such protection by the President, Vice President, President-elect, and Vice President-elect mandatory. *See* Pub. L. No. 98-587, 98 Stat. 3110 (1984) (codified at 18 U.S.C. § 3056(a)).[2]

---

[1]The Secret Service began protecting presidents part-time in 1894, and full-time (albeit with only two officers) after the assassination of President William McKinley in 1901. *See Secret Service History*, U.S. SECRET SERVICE, http://www.secretservice.gov/history.shtml (2012). Until 1951, the agency's authority to protect the President derived solely from annual congressional appropriations to the Department of the Treasury, of which it was then a component. *Id.* In 2002, the Secret Service became a component of the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 821, 116 Stat. 2135, 2224 (codified at 6 U.S.C. § 381).

[2]The statute also authorizes Secret Service protection for other individuals, including members of the President's family, former presidents, and major presidential candidates. It provides that protection "may be declined" by those individuals, but does not extend the option to the President, Vice President, President-elect, or Vice President-elect. 18 U.S.C. § 3056(a).

The Secret Service's authorizing statute extends protection not only to the persons of the President and Vice President, but also to the buildings in which they live and work, including the White House Complex. *See* 18 U.S.C. § 3056A(a)(1)-(2); White Decl. ¶ 5. The White House Complex includes the White House, the Eisenhower Executive Office Building (EEOB), their surrounding grounds, and the New Executive Office Building. White Decl. ¶ 4. Those buildings house offices for the President and the Vice President, as well as their staff and advisors.

In order to carry out its statutory responsibilities, the Secret Service monitors and controls access to the White House Complex. It accomplishes this task through an electronic system known as the White House Access Control System (WHACS). WHACS has two principal components: the Worker and Visitor Entrance System (WAVES) and the Access Control Records System (ACR).

WAVES records are generated in the following way. Generally, when the President, Vice President, or a member of their staffs wants to receive a visitor at the White House Complex, an authorized White House pass holder must submit information about the visitor and visit to the Secret Service. *See* Mem. of Understanding Between White House Office of Records Mgmt. & U.S. Secret Serv. Records Mgmt. Program ¶ 4 (May 17, 2006) (MOU). That information includes (inter alia) the visitor's name, the date and location of the planned visit, and the name of the pass holder submitting the request. *Id.* "Ordinarily, this identifying information is provided to the Secret Service electronically. An authorized . . . pass holder enters the information into a computer that automatically forwards it to the Secret Service for processing." Droege Decl. ¶ 6. The information may also be provided to the Secret Service in other ways, including by telephone and email, in which case

Secret Service personnel transmit the information electronically to the WHACS server. *Id.*; White Decl. ¶ 7.[3]

Once a visitor is cleared into the White House Complex, he or she is generally issued a badge. ACR records are generated (and WAVES records updated) whenever the visitor swipes the badge over one of the electronic pass readers located at the White House Complex's entrances and exits. MOU ¶ 5; Droege Decl. ¶ 7; White Decl. ¶¶ 9, 10. ACR records include the pass holder's name, the time and date of the swipe, and the post at which the swipe was recorded. MOU ¶ 5.

According to the government, the information contained in WHACS records is provided to and used by the Secret Service "for two limited purposes": to perform a background check on the visitor, and to verify the visitor's admissibility at the time of the visit. MOU ¶ 12; White Decl. ¶ 7. Once the visit ends, the information "has no continuing usefulness to the Secret Service." MOU ¶ 13.

Because the Secret Service has "no continuing interest" in the information, "[s]ince at least 2001, it has been [its] practice . . . to transfer newly-generated WAVES records" to the White House every 30 to 60 days on compact discs. White Decl. ¶ 11; Droege Decl. ¶ 10; *see* MOU ¶ 14; Lyerly Decl. ¶ 10 (May 2006). The Secret Service erases the transferred records from the WHACS servers and overwrites them with new records. MOU ¶ 14; White Decl. ¶ 11. Prior to October 2004, the Secret Service did not keep copies of the transferred WAVES records. Lyerly Decl. ¶¶ 10, 11 (May 2006); *see* MOU ¶ 14. In October 2004, however, the Secret Service began retaining copies of the

---

[3]The Secret Service may add additional information to WAVES records that it learns through a background check. Lyerly Decl. ¶ 8 (Sept. 2006); White Decl. ¶¶ 7, 8.

transferred WAVES records on compact discs, due in part to then-pending litigation. MOU ¶ 16; Lyerly Decl. ¶ 13 (Sept. 2006); Droege Decl. ¶ 10.

"At least as early as 2001 (at the end of the Clinton Administration), and upon revisiting the issue in 2004, the Secret Service and the White House recognized and agreed that ACR records should be treated in a manner generally consistent with the treatment of WAVES records." White Decl. ¶ 13; Droege Decl. ¶ 11. In particular, "[t]he White House and the Secret Service . . . determined that ACR records should be transferred to the [White House] and deleted from the Secret Service's computers like WAVES records." White Decl. ¶ 13; *see* MOU ¶ 15. Since at least 2006, the Service has transferred ACR records to the White House, generally every 30 to 60 days. Droege Decl. ¶ 11; *see* White Decl. ¶ 13 (stating that ACR records dating from 2001 were also transferred in 2006). Once again, however, the Service has retained copies of the records due in part to pending litigation. Droege Decl. ¶ 11; White Decl. ¶ 13; MOU ¶ 15.

The volume of FOIA litigation regarding White House visitor records increased in 2006. In that year, a FOIA request was filed for all WHACS records pertaining to visits scheduled with Vice President Dick Cheney or his staff. *See Wash. Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 64 (D.D.C. 2006). A steady march of similar requests followed. They included requests for records of every visit by lobbyist Jack Abramoff, *see Judicial Watch, Inc. v. U.S. Secret Serv.*, 579 F. Supp. 2d 143, 145 (D.D.C. 2008); every visit by lobbyist Stephen Payne, *Citizens for Responsibility & Ethics in Wash. (CREW) v. U.S. Dep't of Homeland Sec.*, 592 F. Supp. 2d 127, 129 (D.D.C. 2009); and every visit by eighteen health care

executives,[4] to name only a few.[5]  The Secret Service refused each request, asserting that WAVES and ACR records are not "agency records" subject to FOIA, but rather are "Presidential records" subject to the more restrictive disclosure regime established by the Presidential Records Act (PRA), 44 U.S.C. §§ 2201 *et seq.  See, e.g.*, *CREW*, 592 F. Supp. 2d at 131; *Wash. Post*, 459 F. Supp. 2d at 65.

In May 2006, the White House and the Secret Service executed a Memorandum of Understanding (MOU).  The MOU memorialized the parties' historical practice and intentions regarding WHACS records, as described above.  It also stated the parties' joint "agreement" that WHACS records are "Presidential Records," and "are not the records of an 'agency' subject to the Freedom of Information Act."  MOU ¶ 17.

In 2008, a suit arising out of a FOIA request for WHACS records reached this court for the first time.  The request sought records of every visit by nine "conservative Christian leaders." *CREW v. U.S. Dep't of Homeland Sec.*, 527 F. Supp. 2d 76, 78 (D.D.C. 2007).  We dismissed that appeal for lack of jurisdiction.  *See CREW v. U.S. Dep't of Homeland Sec.*, 532 F.3d 860, 868 (D.C. Cir. 2008).  After further proceedings in the district court, the parties settled the dispute.  *See* Joint Mot. to Vacate, *CREW v. U.S. Dep't of Homeland Sec.*, No. 06-1912 (D.D.C. Sept. 9, 2009).

---

[4]*See* Letter from Gregory B. Craig, Counsel to the President, to Anne L. Weismann (Sept. 3, 2009) (Craig Letter), *available at* http://whitehouse.gov/assets/blog/9 3 09 Ltr to Weismann.pdf.

[5]For other such requests, see *Judicial Watch, Inc. v. U.S. Secret Serv.*, 579 F. Supp. 2d 151, 152 (D.D.C. 2008) (every visit by any of eight named lobbyists); Craig Letter (every visit by sixteen specified coal industry executives).

The present litigation involves the latest and broadest FOIA request for WHACS records. On August 10, 2009, Judicial Watch asked the Secret Service for "[a]ll official visitors logs and/or other records concerning visits made to the White House from January 20, 2009 to present." The Service denied the request on October 8, 2009, reiterating its position that WAVES and ACR records are not "agency records" subject to FOIA, but rather are "Presidential records" subject to the PRA. The Service noted, however, that Judicial Watch could secure discretionary release of some of those records pursuant to a voluntary disclosure policy that the Obama administration had announced the previous month. *See* The White House, *White House Voluntary Disclosure Policy: Visitor Access Records* (Sept. 4, 2009), http://www.whitehouse.gov/VoluntaryDisclosure (J.A. 42).[6]

On December 7, 2009, Judicial Watch filed suit to compel disclosure pursuant to FOIA. Thereafter both sides moved for summary judgment. The district court ruled in favor of Judicial

---

[6]The Obama administration announced that, going forward, it would release most WAVES and ACR records 90 to 120 days after they are created. The policy excepts the release of records that would threaten national security or the security of staff, reveal particularly sensitive meetings, or disclose personal guests of the families of the President or Vice President. To implement the policy, White House Complex staffers who submit visitor information must designate visits regarded as sensitive. The White House stated that the new policy would not apply to records created before September 15, 2009 because it would be too difficult to retroactively sort those earlier records, which do not include such designations. *See* Tibbits Decl. ¶¶ 15-16, 27-37. But the White House said it would respond to individual requests seeking records created between January 20, 2009 and September 15, 2009, if the requests "are reasonable, narrow, and specific." *See White House Voluntary Disclosure Policy*, http://www.whitehouse.gov/VoluntaryDisclosure.

Watch. *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 803 F. Supp. 2d 51 (D.D.C. 2011). The court held that WHACS records qualify as "agency records" subject to FOIA, and it rejected the Secret Service's contentions that disclosure would raise separation-of-powers concerns and place impermissible burdens on senior White House advisors. *Id.* at 60-62. The Secret Service then filed an appeal pursuant to 28 U.S.C. § 1292(a)(1), and the district court issued a stay of its order pending appeal. *See* Order, *Judicial Watch, Inc. v. U.S. Secret Serv.*, No. 09-2312 (Nov. 14, 2011).[7]

II

Under FOIA, agencies must make requested records available "to any person," unless one of nine specific exemptions applies. 5 U.S.C. § 552(a)(3)(A); *see id.* § 552(b)(1)-(9). The Act grants federal district courts jurisdiction "to order the production of any *agency records* improperly withheld from the complainant." *Id.* § 552(a)(4)(B) (emphasis added). The question at issue on this appeal is whether WHACS records are "agency records."

---

[7]A FOIA disclosure order is injunctive in nature, and is therefore immediately appealable as an interlocutory order, if it "requires the disclosure of documents for which the agenc[y] claim[s] no basis for non-disclosure beyond the argument already rejected by the district court." *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 128 (D.C. Cir. 2005); *see CREW*, 532 F.3d at 863-64. In this case, the district court directed the Secret Service to disclose any records that are not subject to a FOIA exemption, *see* 5 U.S.C. § 552(b)(1)-(9), and that can be identified as such without undue burden. *Judicial Watch*, 803 F. Supp. 2d at 62. Because the Service represents that it has identified at least one record for which it has no basis for non-disclosure beyond the arguments already rejected by the district court, *see* Ulmer Decl. ¶ 4; Oral Arg. Recording at 14:30, we have jurisdiction under 28 U.S.C. § 1292(a)(1).

10

A

We review the district court's grant of summary judgment on this question de novo. *See Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006). A court may grant summary judgment only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On "summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). In FOIA cases, "'[s]ummary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Consumer Fed'n*, 455 F.3d at 287 (quoting *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)).

Although the district court ruled against the Secret Service, it nonetheless relied heavily on both the 2006 MOU and declarations by Secret Service and White House officials to describe the purpose, generation, and use of WHACS records, as well as the government's intentions, understandings, and practice regarding those records. *See Judicial Watch*, 803 F. Supp. 2d at 53-54, 56-60. *See, e.g.*, MOU ¶¶ 10-16; Droege Decl. ¶ 12 (stating that the MOU "documented what was then understood to be past practice and interests regarding WAVES and ACR records"). Judicial Watch has never contested any of those factual descriptions. And because the case was decided against the Service on summary judgment, we are bound by them. Oral Arg. Recording at 45:45 - 47:00 (acknowledgment

by Judicial Watch).[8]  We are not, however, bound by the MOU's legal assertions that WHACS records "are at all times Presidential Records," "are not the records of an 'agency' subject to [FOIA]," and "are under the exclusive legal custody and control of the White House."  MOU ¶¶ 17-18.

B

As both the Supreme Court and this court have repeatedly noted, while FOIA "limited access to 'agency records,'" it "did not provide any definition of 'agency records.'"  *Forsham v. Harris*, 445 U.S. 169, 178 (1980); *see U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989); *Consumer Fed'n*, 455

---

[8] *See Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004) (reciting the facts "in the light most favorable to" the respondent "[b]ecause th[e] case was decided against [her] on the [petitioner's] motion for summary judgment"); *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1054 n.7 (D.C. Cir. 1981) ("Because [the appellant] did not contest the Government's [factual] assertions[,] . . . Rule 56(e) of the Federal Rules of Civil Procedure requires this court to take the Government's assertions as true. . . . In other words, failure to raise a genuine issue as to a material fact constitutes a concession that the uncontested fact is true for purposes of summary judgment."); *see also Malik v. District of Columbia*, 574 F.3d 781, 783 n.1 (D.C. Cir. 2009).

In a footnote to its brief, Judicial Watch appears to treat the MOU with some skepticism, noting that it was executed by the Bush Administration just four months after Judicial Watch and CREW submitted their 2006 FOIA requests relating to visits by lobbyist Jack Abramoff.  *See* Judicial Watch Br. 10 n.3; *see also Judicial Watch*, 803 F. Supp. 2d at 58 n.3.  Given the summary judgment posture of this case, however, there is no room for such skepticism in our legal analysis.

F.3d at 287; *Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1067 (D.C. Cir. 1988), *aff'd*, 492 U.S. 136 (1989); *McGehee v. CIA*, 697 F.2d 1095, 1106 (D.C. Cir. 1983). Nonetheless, we do know two things that help us define the scope of the term.

The first thing we know is that, as the Supreme Court held in *Kissinger v. Reporters Committee for Freedom of the Press*, Congress did not intend the word "agency" to include the President, his "'immediate personal staff[,] or units in the Executive Office whose sole function is to advise and assist the President.'" 445 U.S. 136, 156 (1980) (quoting H.R. REP. NO. 93-1380, at 232 (1974) (Conf. Rep.)). We have collectively referred to those staff and units as the "Office of the President," *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1295 (D.C. Cir. 1993); *see also Kissinger*, 445 U.S. at 156, and do so here as well for ease of reference.[9]

Because the Office of the President is not an agency for FOIA purposes, documents generated by staff or units within that Office are "not 'agency records' when they [are] made." *Kissinger*, 445 U.S. at 156.[10] It is therefore undisputed that a

---

[9]As noted below, this court has held that records of the Vice President and his immediate staff are likewise not agency records for purposes of FOIA. *See infra* Part IV.A (citing *Wilson v. Libby*, 535 F.3d 697, 708 (D.C. Cir. 2008)); *see also Schwartz v. U.S. Dep't of the Treasury*, No. 00-5453, 2001 WL 674636 (D.C. Cir. May 10, 2001) (unpublished order), *aff'g* 131 F. Supp. 2d 142, 147-48 (D.D.C. 2000); *Meyer v. Bush*, 981 F.2d 1288, 1295 (D.C. Cir. 1993). We therefore include them within the collective descriptor, "Office of the President."

[10]*Accord Tax Analysts*, 492 U.S. at 143; *Armstrong v. Exec. Office of the President*, 1 F.3d at 1295 (D.C. Cir. 1993); *Meyer*, 981 F.2d at 1293 n.3; *McGehee*, 697 F.2d at 1107 n.53; *Ryan v. Dep't of*

requester could not use FOIA to compel the President or his advisors to disclose their own appointment calendars or visitor logs.  *See* Oral Arg. Recording at 23:45 (acknowledgment by Judicial Watch).  In part, Congress exempted such records from FOIA -- and later subjected them to the Presidential Records Act instead -- in order to avoid serious separation-of-powers concerns that would be raised by a statute mandating disclosure of the President's daily activities.  *See, e.g.*, *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991); *Ryan v. Dep't of Justice*, 617 F.2d 781, 788 n.19 (D.C. Cir. 1980).

The second thing we know is that not all documents in the possession of a FOIA-covered agency are "agency records" for the purpose of that Act.  *See Ryan v. Dep't of Justice*, 617 F.2d 781, 785 (D.C. Cir. 1980).  As the Supreme Court instructed in *Tax Analysts*, the term "agency records" extends only to those documents that an agency both (1) "create[s] or obtain[s]," *and* (2) "control[s] . . . at the time the FOIA request [was] made." 492 U.S. at 144-45.  From this instruction, we know that not all records physically located at an agency are "agency records." *See, e.g.*, *Kissinger*, 445 U.S. at 157-58 (summaries of Henry Kissinger's telephone conversations as National Security Advisor that he brought from the White House to the State Department); *Consumer Fed'n*, 455 F.3d at 288-93 (personal appointment calendar kept on an agency computer); *Goland v. CIA*, 607 F.2d 339, 344-48 (D.C. Cir. 1978) (congressional hearing transcript in the possession of the CIA).  Nor are all documents that are generated by an agency "agency records." *See United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 600-02 (D.C. Cir. 2004) (portions of IRS document generated in response to a congressional request).  Rather, to determine whether a document is an agency record under *Tax Analysts*, we must "focus[] on a variety of factors surrounding the creation,

---

*Justice*, 617 F.2d 781, 788 (D.C. Cir. 1980).

14

possession, control, and use of the document." *Consumer Fed'n*, 455 F.3d at 287 (quoting *Bureau of Nat'l Affairs, Inc. v. U.S. Dep't of Justice*, 742 F.2d 1484, 1490 (D.C. Cir. 1984)).

We discuss each of these points in greater detail in the following two parts. In Part III, we examine the manner in which *Tax Analysts* and the "control" tests this court has adopted to implement the Court's instruction apply to WHACS records. In Part IV, we examine Congress' intention to exclude the President's appointment calendars from FOIA, and the importance of construing the Act to avoid the significant separation-of-powers concerns that would arise if the Act were construed in a way that effectively permitted requesters to reconstruct those calendars. Both examinations lead us to conclude that WHACS records that reveal visitors to the Office of the President are not "agency records."

There is a subset of WHACS records, however, that reveals nothing about visits to the Office of the President. Those records are generated by visits to components of the White House Complex that are not part of that Office, and that are themselves "agencies" covered by FOIA. We discuss those WHACS records in Part V, and conclude that they *are* "agency records" subject to FOIA.

III

As noted above, *Tax Analysts* instructs that a document is not an "agency record" unless an agency both (1) "create[s] or obtain[s]" it, *and* (2) "controls" it at the time of the FOIA request. 492 U.S. at 144-45. Turning briefly to the instruction's first prong, we note some uncertainty as to which entity "created" the WHACS records. That question was not at issue in *Tax Analysts*, a case involving paper documents that were created by one author, at one time, and in one place. *See id.* at

139-40 (FOIA request for district court tax opinions obtained by the Department of Justice). The "creator" of an electronic record, by contrast, is more ambiguous. WHACS records, for example, exist only because a White House employee specifically requested that a particular visitor be admitted to the White House Complex. Most of those records were not generated by or at the Secret Service, but rather by electronic entries made at the White House Complex -- first by staff of the Complex, and then by a visitor's swipe. *See supra* Part I; Judicial Watch Br. 7 ("ACR records are created when a visitor swipes his or her pass upon entering or exiting the White House Complex."); *cf. supra* note 3 (describing additions the Secret Service may make to WHACS records).

But we need not delve into the creation question more deeply at this point because there is no dispute that the Secret Service ultimately "obtained" the WHACS records, thus satisfying the first prong of *Tax Analysts*. This leaves us with the second prong: whether the Secret Service "controlled" the records at the time of Judicial Watch's FOIA request.

## A

In the usual case, this circuit looks to four factors to determine "whether an agency has sufficient 'control' over a document to make it an 'agency record.'" *Tax Analysts*, 845 F.2d at 1069. They are:

> [1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

*Id*.  The circuit first announced this test in our own decision in the *Tax Analysts* case, which the Supreme Court subsequently affirmed, albeit on different grounds.  Since then, we have reaffirmed the four-factor test on several occasions.  *See Judicial Watch, Inc. v. Fed. Hous. Fin. Agency*, 646 F.3d 924, 926-27 (D.C. Cir. 2011); *United We Stand*, 359 F.3d at 599; *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996).

This is the test upon which the district court relied in granting summary judgment in favor of Judicial Watch, *see Judicial Watch*, 803 F. Supp. 2d at 57-60, and it is the test that Judicial Watch urges us to apply on appeal, *see* Judicial Watch Br. 9; Oral Arg. Recording at 23:00.[11]  For reasons discussed in Part III.B, we conclude that this test does not fully capture the "control" issue in this case.  Even by its own terms, however, the four-factor test is indeterminate as applied to WHACS records.

1.  The district court found that "the first factor of the determination, intent, weighs in favor of the Secret Service's assertion that the records are not under agency control." *Judicial Watch*, 803 F. Supp. 2d at 57.  The MOU "is unequivocal in asserting that the control over WAVES and ACR records is at all times maintained by the [White House] and not the Secret Service." 803 F. Supp. 2d at 58.  It further states that "any information provided to the Secret Service" for the creation of such records "is provided under an express reservation of White House control." MOU ¶ 19.  And the requisite intent is

---

[11]The Court's decision in *Tax Analysts* stated that "control" means "that the materials have come into the agency's possession in the legitimate conduct of its official duties."  492 U.S. at 145.  We have regarded the four-factor test as a gloss on that statement.  *See Judicial Watch v. Fed. Hous. Fin. Agency*, 646 F.3d at 926-27.

present regardless of who is regarded as the records' creator, as the MOU provides that "the White House at all times asserts, and the Secret Service disclaims, all legal control over any and all WHACS records." *Id.* ¶ 24.

For these reasons, we agree with the district court that "[t]he 'intent' factor of the analysis . . . weighs in the defendant's favor." 803 F. Supp. 2d at 58. Judicial Watch does not dispute the point. Judicial Watch Br. 8. Resolution of the remaining three factors, however, is more complicated.

2. The district court concluded that the second factor, "the ability of the agency to use and dispose of the records as it sees fit," weighs against the Secret Service. *Judicial Watch*, 803 F. Supp. 2d at 58. We are not so sure. Although it is undisputed that the Service has authority to use the records, it does not have the ability to use and dispose of them "as it sees fit." According to the MOU, the Service may use the records for only "two limited purposes": "to perform background checks to determine whether, and under what conditions, to authorize [a] visitor's temporary admittance to the White House Complex," and "to verify the visitor's admissibility at the time of the visit." MOU ¶ 12; *see* Droege Decl. ¶ 5. Likewise, the MOU provides that the Service will transfer the records to the White House within 60 days of the visit, and then purge them from its system. MOU ¶ 14; *see* White Decl. ¶ 11. At least with respect to WAVES records, this practice predates the MOU. *See* Droege Decl. ¶¶ 10-11. And while the agency began retaining copies of WHACS records in 2004, it did so principally because of pending litigation. *See id.*; MOU ¶ 16. It is plain that if the current litigation ends in the Service's favor, the agency will revert to its prior practice of transferring all WHACS records to the White House.

The district court characterized as "circular" the Secret Service's argument that, "'because the President and Vice President retain control of WAVES and ACR records (as set forth in the MOU), the Secret Service lacks disposal authority over these records.'" *Judicial Watch*, 803 F. Supp. 2d at 59 (quoting Mem. in Support of Def.'s Cross-Motion for Summ. J. at 19-20). The court thought the argument circular because it viewed its validity as dependent upon the Service winning its claim that the documents are not agency records. *Id.* We think this misapprehends the Service's argument.

In deciding whether a document is an agency record under FOIA, we examine how the agency would treat the records in its normal course of operations, in the absence of pending FOIA-related litigation. *Cf. Kissinger*, 445 U.S. at 151-52 ("Most courts which have considered the question have concluded that the FOIA is only directed at requiring agencies to disclose those 'agency records' for which they have *chosen* to retain possession or control." (emphasis added)). The Secret Service has pointed to evidence that demonstrates restrictions on its ability to use and dispose of WHACS records: a longstanding practice of turning all such records over to the White House, Droege Decl. ¶¶ 10-11, and a written agreement restricting the Service from using and retaining those records in ways other than those specified therein, MOU ¶¶ 12-14. As we explained in *United We Stand* -- and as we discuss in more detail in Section III.B -- restrictions on use and disposal imposed by a governmental entity not covered under FOIA may have a substantial bearing on the second *Tax Analysts* factor. *See United We Stand*, 359 F.3d at 600; *Goland*, 607 F.2d at 347 (examining "the conditions attached to [a document's] possession" by its creator).

3. The district court concluded that "the third factor -- the extent to which Secret Service personnel have read or relied

upon the documents -- cuts strongly against the Secret Service." *Judicial Watch*, 803 F. Supp. 2d at 59. With this, we agree. It is true, as the Secret Service argues, that its personnel read and rely upon the documents only for the limited purposes the records serve: to enable the Service to perform background checks and verify admissibility at the time of a visitor's entrance. But the agency reads and relies upon the documents for those purposes without restriction, and the third factor requires no more.

4. The final of the four factors is "the degree to which the document[s] w[ere] integrated into the [Secret Service's] record system or files." *Tax Analysts*, 845 F.2d at 1069. The district court concluded that this factor "weighs against the Secret Service." *Judicial Watch*, 803 F. Supp. 2d at 60. Given the Service's acknowledgment that "WAVES and ACR records do reside on the Secret Service's servers as part of the [WHACS] data system," *id.* (quoting Mem. of Law in Support of Def.'s Cross-Motion for Summ. J. at 21); *see* Lyerly Decl. ¶¶ 19, 20 (Sept. 2006), we agree that the records were in the agency's files at least at one time.

But we have some reservations about the *degree* to which they were or are *integrated into* the Secret Service's overall record system. The WHACS computer servers are physically located in the White House Complex (in the EEOB), and they contain WAVES- and ACR-related data only. Nelson Decl. ¶ 3.[12] Although WAVES and ACR records are uploaded to the WHACS servers when they are created, they are removed from those servers within 60 days. *See* MOU ¶¶ 14-15; White Decl.

---

[12]Both the primary and secondary (backup) WHACS servers are located in the EEOB. A tertiary server is located at a Secret Service location as a "backup to a backup" in case of an emergency. Nelson Decl. ¶ 3.

¶ 11 (stating that [WHACS] records are downloaded and burned onto CDs for transfer to the White House every 30 to 60 days, and that "active WAVES data on the servers older than 60 days are purged daily and overwritten on the servers"); Droege Decl. ¶ 11 (regarding ACR records). Due to pending litigation, it appears that the documents are thereafter transferred to compact disc storage, where they are no longer used by the Service. MOU ¶ 16; Droege Decl. ¶¶ 10, 11. And but for the pending litigation, they would be removed from the Service's files entirely. Lyerly Decl. ¶ 26 (Sept. 2006).

5. In sum, we conclude that one of the factors in the four-factor control test unambiguously favors the Secret Service's position, one unambiguously favors Judicial Watch's position, and two are relatively uncertain. This circuit's descriptions of the four-factor test do not make clear what to do when the factors point in different directions, with different intensities. Nor do our descriptions make clear whether the factors should receive equal weight. In *Tax Analysts* itself, we suggested that "all four factors" must be present before "an agency has sufficient 'control' over a document to make it an 'agency record.'" 845 F.2d at 1069. But we have also subsequently described the test as a "totality of the circumstances test." *Consumer Fed'n*, 455 F.3d at 287 (quoting *Bureau of Nat'l Affairs*, 742 F.2d at 1490).

Our past application of the test reveals its considerable indeterminacy. In some cases, we have heeded the suggestion in *Tax Analysts*, finding that documents were not "agency records" when fewer than all four factors pointed in that direction.[13] In other cases, we have found that documents were

---

[13] *See Judicial Watch, Inc. v. Fed. Hous. Fin. Agency*, 646 F.3d at 928 (holding that documents transferred to FHFA by entities for which it was the conservator were not agency records, notwithstanding the

"agency records" even though fewer than four factors indicated as much.[14]

Accordingly, if the four-factor test were the only relevant consideration, we would be left with an uncertain result. That uncertainty would redound to the benefit of Judicial Watch, in light of the Supreme Court's instruction that the "burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records,'" *Tax Analysts*, 492 U.S. at 142 n.3. But the four-factor test is not the only test relevant to the FOIA request at issue in this case. Rather, we have indicated that a somewhat different control test applies when there are "special policy considerations" at stake. *Paisley v. CIA*, 712 F.2d 686, 693 n.30 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984). Such special considerations are at stake here.

B

In a series of cases stretching from 1978 to 2004, this circuit has indicated that the standard, four-factor control test does not apply to documents that an agency has either obtained from, or prepared in response to a request from, a governmental entity not covered by FOIA: the United States Congress. *See United We Stand*, 359 F.3d at 599. In those cases, we have said,

---

entities' intent to relinquish control and FHFA's ability to use and dispose of the documents as it saw fit); *Consumer Fed'n*, 455 F.3d at 290, 293 (concluding that an employee's personal electronic calendar was not an agency record, notwithstanding that it was on the agency's computer system).

[14]*See, e.g.*, *Burka*, 87 F.3d at 515 (finding that data tapes were agency records notwithstanding that they were not in the agency's files).

"special policy considerations . . . counsel in favor of according due deference to Congress' affirmatively expressed intent to control its own documents." *Paisley*, 712 F.3d at 693 n.30. In such cases, whether an agency's "response is subject to FOIA turns on whether Congress manifested a clear intent to control the document." *United We Stand*, 359 F.3d at 596. This focus renders the first two factors of the standard test effectively dispositive.

The first case in this line was *Goland v. CIA*, in which a FOIA requester sought disclosure of the CIA's copy of a congressional hearing transcript that a congressional committee had marked "secret." 607 F.2d at 343. In concluding that the transcript was not an agency record, we explained that "Congress exercises oversight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress' originating intent." *Id.* at 346. Subjecting the document to FOIA, we said, would force Congress "either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role." *Id.* And because "on all of the facts of the case Congress' intent to retain control of the document [wa]s clear," we ruled that the transcript was a congressional document rather than an agency record. *Id.* at 348. In light of "the conditions attached to its possession," we concluded that the CIA "is not free to dispose of the Transcript as it wills, but holds the document, as it were, as a 'trustee' for Congress." *Id.* at 347.

In several subsequent cases, we concluded that congressional documents in the hands of agencies *were* agency records. In so doing, however, we reaffirmed the *Goland* analysis, finding the documents covered by FOIA only because Congress had not clearly expressed an intent to retain control over them. *See Paisley*, 712 F.2d at 696 (finding that documents

created by the CIA in response to congressional requests for information were agency records because there were insufficient "indicia of congressional intent" to control the documents); *Holy Spirit Ass'n for the Unification of World Christianity v. CIA*, 636 F.2d 838, 840 (D.C. Cir. 1980) (holding that, "even if" requested CIA documents generated in response to congressional inquires were "once excluded from the FOIA as congressional records," they were "no longer covered by that exemption because Congress failed to express with sufficient clarity its intent to retain control over the[m]"); *Ryan*, 617 F.2d at 786 (holding that responses to a questionnaire the Attorney General had sent to all Senators were agency records, because the Senators "gave no indication that they wished to limit [the Attorney General's] use of them," and because there was "no evidence . . . that the President in any way diminished the Attorney General's control over the[] documents").

The culmination of this line was our decision in *United We Stand America, Inc. v. IRS*. That case concerned documents the IRS had created in response to a request for information from a congressional committee. 359 F.3d at 597-98. Direct application of the Supreme Court's decision in *Tax Analysts* was "not so simple," we said, because "the connection between Congress and the requested records implicates considerations not at issue in *Tax Analysts*." *Id.* at 599.[15] Reviewing our

---

[15] *Tax Analysts* did not present the problem of a non-FOIA entity exerting control over documents in the hands of a FOIA agency. Although it did involve records that had been created by another Branch -- copies of district court tax decisions that were in the possession of the Justice Department -- the courts did not object to their release. We made this clear in our own opinion below, noting that the decisions at issue in the case "remain unencumbered by judicial limitations on dissemination," *Tax Analysts*, 845 F.2d at 1069, and that decisions upon which courts did place limits "probably would

previous cases, we found that "their focus on congressional control . . . reflects the considerations that underlie the second factor [in the four-factor test]:  the agency's ability to use or dispose of the record as it sees fit." *Id.* at 600.  "Emphasizing that Congress's intent to control and the agency's ability to control 'fit together in standing for the general proposition that the agency to whom the FOIA request is directed must have exclusive control of the disputed documents,'" we held that, if "'Congress has manifested its own intent to retain control, then the agency -- by definition -- cannot lawfully "control" the documents.'"  *Id.* (quoting *Paisley*, 712 F.2d at 693). Ultimately, we found that there were "sufficient indicia of congressional intent to control" those portions of the IRS documents that would reveal Congress' requests to the agency, *id.*, and therefore found that those portions were not agency records.[16]

The instant case resembles *United We Stand* in several important respects.  First, this case also involves documents that an agency created in response to requests from, and information provided by, a governmental entity not covered by FOIA. WHACS records are created in response to requests by the Office of the President[17] to grant visitors access to the White

---

not be considered 'agency records,'" *id.* at 1068 n.18.

[16]At the same time, we found that Congress had not manifested an intent to control certain other documents, or parts of other documents, that would not reveal the requests that Congress had made to the agency. *United We Stand*, 359 F.3d at 601.  Judicial Watch has not argued that there are WHACS records, or parts of any such records, that would not reveal visitor information transmitted by the White House to the Secret Service.

[17]In Part V, we address WHACS records created in response to requests by White House components that are not part of the Office of

House Complex, and they contain visitor information provided by that Office. *See* MOU ¶ 11 ("The information contained in WHACS Records originates with White House pass holders, visitors, and workers as a result of White House business.").[18] Second, as in *United We Stand*, the non-covered entity -- here, the White House -- has "manifested a clear intent to control" the documents. *Id.* at 597; *see supra* Part III.A.1; MOU ¶ 19 ("[A]ny information provided to the Secret Service for the creation" of such records "is provided under an express reservation of White House control."). And that means the agency is not free to use and dispose of the documents as it sees fit. *See supra* Part III.A.2; *see, e.g.*, MOU ¶ 22 (providing that the Secret Service "will regularly transfer all WHACS Records in its possession" to the White House and that it "will not retain its own copies of any WHACS Records").[19] Third, again as in *United We Stand*, disclosing the records would reveal the

---

the President.

[18]As noted above, the Secret Service may add information to some WAVES records that its own personnel learn through background checks. *Supra* note 3; *see* Lyerly Decl. ¶ 8 (Sept. 2006); White Decl. ¶¶ 7, 8. But the creation of that information is generated in response to the White House's request for visitors' access; its disclosure would reveal information provided by the White House (e.g., the identities of visitors); and the White House has asserted control over all WHACS records. MOU ¶ 18. Those portions of WAVES records therefore also fall within the compass of *United We Stand*. *See, e.g.*, 359 F.3d at 601-02 (permitting the agency to withhold portions of its response to Congress that would reveal Congress' request).

[19]Moreover, given the limitations imposed on the Secret Service's use of the documents, it is plain that the Service does not have "'*exclusive* control of the disputed documents.'" *United We Stand*, 359 F.3d at 600 (quoting *Paisley*, 712 F.2d at 693) (emphasis added).

specific requests made by the non-covered entity -- here, the Office of the President's requests for visitor clearance.

If anything, the indicia of White House control in this case are even stronger than the indicia of congressional control in *United We Stand*. There, the Joint Committee on Taxation had demanded only a limited scope of confidentiality and hence asserted control over only a limited subset of documents. 359 F.3d at 600-01. Here, the White House has manifested its intent to control the entirety of the WHACS records, all of which it expects the Secret Service to transfer to it. *See* MOU ¶ 15. The expression of that intent is not merely "general," *United We Stand*, 359 F.3d at 602. Rather, it explicitly extends to each of the "'particular records'" at issue, *id.* (quoting *Paisley*, 712 F.2d at 695).[20]

Judicial Watch and its amici argue that the analysis of *United We Stand* and its predecessors should be limited to documents created by or at the instance of Congress, not the White House.[21] Subjecting the latter to FOIA, they say, would

_____

[20]Amici for Judicial Watch argue that, because the MOU in this case was "[e]xecuted after litigation ensued" over the status of White House visitor logs, it should be given no weight. CREW Br. 16. But the MOU was executed well before *this* litigation ensued and well before the creation and transfer of the documents at issue in *this* case. *See Holy Spirit*, 636 F.2d at 842 (holding that a congressional letter written "as a result of . . . *this* litigation long after the actual transfer to the CIA" was insufficient, but stating that "we do not adopt appellant's position that Congress must give contemporaneous instructions when forwarding congressional records to an agency" (emphasis added)).

[21]Judicial Watch is correct that we have not previously held that the analysis of *Goland* and its progeny extends to presidential communications. But we have certainly suggested that it does. *See*

not analogously force the President "either to surrender [a] constitutional prerogative of maintaining secrecy, or to . . . suffer an impairment of [an] oversight role," *United We Stand*, 359 F.3d at 599 (quoting *Goland*, 607 F.2d at 346).

But the Office of the President has comparable constitutional prerogatives, which we will discuss in more detail in Part IV. In particular, the Executive has a "constitutional prerogative" to "maintain[] the autonomy of its office and safeguard[] the confidentiality of its communications." *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 385 (2004); *see id.* (noting that "special considerations control" in such circumstances). Indeed, Congress crafted FOIA to avoid intruding on the confidentiality of presidential communications. *See Ryan*, 617 F.2d at 788 n.19; *Soucie v. David*, 448 F.2d 1067, 1071-72 (D.C. Cir. 1971); *see also* H.R. REP. NO. 93-1380, at 232 (Conf. Rep.).

---

*Bureau of Nat'l Affairs*, 742 F.2d at 1491-92 ("[W]here documents originate within the Congress, the judiciary, and FOIA-exempt executive agencies, sometimes special policy considerations militate against a rule compelling disclosure of [such] records . . . merely because such documents happen to come into the possession of an agency." (internal quotation marks omitted)); *Ryan*, 617 F.2d at 785 (stating that the *Goland* standard also responds to the "severe problem" that would be created if "materials from the President's immediate staff [that] come into the possession of an agency" are automatically deemed agency records); *see also id.* at 786 (concluding that documents were records of the Justice Department because there was "no evidence . . . that the President in any way diminished [the agency's] control over these documents" and "no indication that [the documents] will ever be transmitted to or seen by the President or his staff"). Nonetheless, the question has never been squarely presented. *See Paisley*, 712 F.2d at 693 n.30 ("We express no view here on whether a different analysis would be warranted were the creating body other than Congress.").

It is true, as amici argue, that our prior cases involved inter-branch communications while the communications at issue here are intra-branch. CREW Br. 11. But that does not make the separation-of-powers issues here any less substantial. Indeed, in one respect they are more substantial: whatever encroachment upon congressional authority we might engender by applying FOIA to congressional communications, it was Congress that passed the Act and Congress that can amend it. No such solution is available to the President if Congress, in enacting FOIA, authorized an intrusion into the confidentiality of his communications.

Subjecting WHACS records to FOIA would thus confront the President with a dilemma similar to the one that concerned us in *Goland* and *United We Stand* -- forcing him either to "surrender [his] constitutional prerogative of maintaining secrecy" regarding his choice of visitors (and therefore of outside advisors), or to decline to cooperate with the executive branch agency entrusted with (and necessary for) his personal protection, *United We Stand*, 359 F.3d at 599 (quoting *Goland*, 607 F.2d at 346). Given 18 U.S.C. § 3056(a) -- which bars the President from declining Secret Service protection -- it is not even clear he would have the latter choice.

These considerations persuade us that the *United We Stand* test is appropriate in this case. And, as discussed above, we find sufficient indicia of presidential control over WHACS records of visits to the Office of the President to satisfy that test. An additional but related consideration, discussed in the following Part, confirms the wisdom of construing the term "agency records" to exclude those records from the scope of FOIA.

IV

In this Part, we discuss separation-of-powers concerns that provide an additional -- and more fundamental -- reason to find that the logs of visits to the Office of the President are not "agency records" within the meaning of FOIA.

A

As a result of amendments enacted in 1974, FOIA defines an "agency" as any "establishment in the executive branch of the Government (including the Executive Office of the President)." 5 U.S.C. § 552(f)(1). In *Kissinger*, the Supreme Court held that "the legislative history is unambiguous . . . in explaining that the 'Executive Office' does not include the Office of the President." 445 U.S. at 156. "The Conference Report for the 1974 FOIA Amendments," the Court said, "indicates that 'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President' are not included within the term 'agency' under the FOIA." *Id.* (quoting H.R. REP. NO. 93-1380, at 232 (Conf. Rep.)). In light of this clear expression of congressional intent, the Court held that documents generated by such staff or units are "not 'agency records' when they [are] made." *Id.*; *accord Tax Analysts*, 492 U.S. at 143.

In the years since the *Kissinger* case, this circuit has applied *Kissinger*'s understanding of the scope of the term "agency" to find that individuals employed in the "Office of the President," *Armstrong v. Exec. Office of the President*, 1 F.3d at 1295; the "White House Office," *Meyer v. Bush*, 981 F.2d 1288, 1293 n.3 (D.C. Cir. 1993); the National Security Council, *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 556 (D.C. Cir. 1996); and the "Office of the Vice President," *Wilson v. Libby*, 535 F.3d 697, 708 (D.C. Cir. 2008), are among those whose

documents are excluded from FOIA. It is therefore undisputed that Judicial Watch may not obtain the appointment calendars (or visitor logs) of those individuals -- or of the President or Vice President himself -- by sending a FOIA request to the White House Complex, where employees of those units work. *See* Oral Arg. Recording at 23:45. Their calendars are simply not "agency records" as FOIA defines the term.

As we have explained, however, the President and his staff cannot retain effective physical control over their calendars. Congress requires the President to accept the protection of the Secret Service. *See* 18 U.S.C. § 3056(a). And in order to protect the President, the Secret Service must monitor and control access to the building in which the President lives and works. *See id.* § 3056A; White Decl. ¶¶ 2, 5. To accomplish this, the Service requires presidential staff to request access for visitors, and thereafter requires logging of those visitors' entrances to and exits from the White House Complex. Those procedures result in WHACS records that replicate in key particulars the content of the President's appointment calendars and those of his staff, including the name, time, and appointment of the visitors who enter the White House Complex to see them. *See supra* Part I; MOU ¶ 11. The President thus has little choice but to permit the Secret Service to reconstruct his appointment calendars. Hence, if the Secret Service must disclose WHACS records, a FOIA requester will effectively receive copies of those calendars.

There is good reason to doubt that Congress intended to require the effective disclosure of the President's calendars in this roundabout way. As *Kissinger* noted, Congress' exclusion of the papers of the President (and his advisors) from the coverage of FOIA was quite intentional. And where Congress has intentionally excluded a governmental entity from the Act, we have been unwilling to conclude that documents or

information of that entity can be obtained indirectly, by filing a FOIA request with an entity that *is* covered under that statute.[22]

As noted in Section III.B, the cases in which we have barred such end runs have involved "special considerations" attendant to requiring the disclosure of documents or information generated by Congress itself -- namely, separation-of-powers concerns that would arise were we to construe FOIA to cover such documents or information. But the Supreme Court has made clear that separation-of-powers concerns can also arise in the context of communications by the President and his close advisors. As the Court said in *Cheney*, "*special considerations control* when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." 542 U.S. at 385 (emphasis added); *see id.* at 382 (declaring that "the public interest requires that a coequal branch of Government 'afford Presidential confidentiality the greatest protection consistent with the fair administration of justice,'" and identifying that interest as a "separation-of-powers consideration[]" (quoting *United States v. Nixon*, 418 U.S. 683, 715 (1974))).

Those concerns are implicated here. Construing the term "agency records" to extend to White House visitor logs -- regardless of whether they are in the possession of the White House or the Secret Service -- could substantially affect the

---

[22] *See United We Stand*, 359 F.3d at 603 ("Congressional documents . . . are not subject to FOIA at all and, for the same reason, neither are the portions of the [agency's] response that would reveal the Joint Committee request."); *Goland*, 607 F.2d at 346 ("It may be assumed that plaintiffs could not easily win release of the Hearing Transcript from the House of Representatives; we will not permit them to do indirectly what they cannot do directly because of the fortuity of the Transcript's location.").

President's ability to meet confidentially with foreign leaders, agency officials, or members of the public. And that could render FOIA a potentially serious congressional intrusion into the conduct of the President's daily operations. *See Nixon*, 418 U.S. at 705-06 (1974) ("[T]he protection of the confidentiality of Presidential communications has . . . constitutional underpinnings."); *Ryan*, 617 F.2d at 788 n.19 (stating that a "[f]ailure to exempt presidential staff from the FOIA would raise a constitutional issue of separation of powers").

The Supreme Court has emphasized the importance of "interpreting statutes to avoid deciding difficult constitutional questions where the text fairly admits of a less problematic construction." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455 (1989); *see id.* at 465-67. In *Public Citizen*, it employed that canon in a closely related case involving the Federal Advisory Committee Act (FACA). That Act requires (inter alia) that records of "advisory committees" be made available to the public unless they fall within a FOIA exemption, and it defines an advisory committee as any committee "utilized" by the President or an agency in the interest of obtaining advice or recommendations. 491 U.S. at 451-52 (quoting 5 U.S.C. App. 2 § 3(2)). Although the Court had "no doubt" that the Executive "utilized" -- "in one common sense of the term" -- the American Bar Association's Standing Committee on the Federal Judiciary to obtain advice regarding judicial nominations, the avoidance canon "tip[ped] the balance decisively against FACA's application." *Id.* at 452, 465. In the Court's view, there was "no gainsaying the seriousness of [the] constitutional challenges" that applying FACA to the Standing Committee would engender. *Id.* at 467. Those included the concern that extending FACA to the President's consultations with the Committee "would potentially inhibit the President's freedom to investigate, to be informed, to evaluate, and to consult during the nomination process." *Id.* at 488 (internal

quotation marks omitted). The Court was "loath," it said, "to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils." *Id*. at 466.

This court, sitting en banc, has likewise employed the constitutional avoidance canon to resolve a FACA case. On remand from the Supreme Court's decision in *Cheney*, we construed FACA narrowly so as not to cover an energy policy group composed of the Vice President and other senior government officials, even if private parties were also involved or influential, as long as the private parties lacked a vote or a veto. *In re Cheney*, 406 F.3d 723, 728 (D.C. Cir. 2005) (en banc). Without deciding whether application of FACA to such a committee would be constitutional, we concluded that "separation-of-powers considerations," including "'the Executive Branch's interest in maintaining the autonomy of its office and safeguarding the confidentiality of its communications,'" dictated the narrow construction. *Id.* at 727-28 (quoting *Cheney,* 542 U.S. at 385). *See also Ass'n of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 909, 910 (D.C. Cir. 1993) (declining to apply FACA to a presidential health care task force in order "to avoid the difficult constitutional issue" that would follow from "restrict[ing] the President's ability to seek advice from whom and in the fashion he chooses").

We have also employed the canon directly in the FOIA context. In *Judicial Watch v. Dep't of Energy*, we addressed the question of whether certain documents of the same energy policy group at issue in *Cheney* were "agency records" for purposes of FOIA. 412 F.3d 125 (D.C. Cir. 2005). Once again citing *Cheney*'s admonition that "'special considerations control when the Executive Branch's interest in maintaining the autonomy of its office and safeguarding the confidentiality of its

communications are implicated,'" we concluded that the documents were not "agency records." *Id.* at 132 (quoting *Cheney*, 542 U.S. at 385).

Indeed, this court utilized the avoidance canon in the case that was relied on both by Congress in drafting the 1974 FOIA Amendments, and by the *Kissinger* Court in adopting the "sole function" test that was cited in the legislative history of those amendments. Prior to the amendments, FOIA contained nothing to indicate whether it applied to the President or his advisors. In *Soucie v. David*, we interpreted the Act as excluding "the President's staff" and those units whose "sole function [is] to advise and assist the President." 448 F.2d at 1075. We did so in order to "avoid" the "[s]erious constitutional questions [that] would be presented" if it were "necessary for the court to consider whether the disclosure provisions of the Act exceed the constitutional power of Congress to control the actions of the executive branch." *Id.* at 1071-72; *see McGehee*, 697 F.2d at 1108; *Ryan*, 617 F.2d at 788 n.19.

In subsequently adding the term "Executive Office of the President" to the Act, the Conference Report for the 1974 Amendments (cited in *Kissinger*) explained that "the conferees intend the result reached in *Soucie v. David*," specifically stating that "[t]he term is not to be interpreted as including" the staff and units that *Soucie* had excluded. H.R. REP. NO. 93-1380, at 232 (Conf. Rep.); *see Kissinger*, 445 U.S. at 156; *Meyer*, 981 F.2d at 1291-92. Thus, it appears that not only this court, but Congress as well, wished to avoid the serious separation-of-powers questions that too expansive a reading of FOIA would engender. When that is the case, it is doubly our obligation to seek a construction that avoids constitutional conflict. *See Hamdan v. United States*, 696 F.3d 1238, 1247-48 (D.C. Cir. 2012).

Finally, although the preceding considerations suggest that WHACS records may be a poor fit for FOIA, the same considerations make them a better fit for the Presidential Records Act (PRA), which Congress enacted in 1978 to avoid the very "separation of powers concerns" and "outside interference with the day-to-day operations of the President and his closest advisors" that we have just described, *Armstrong v. Bush*, 924 F.2d at 290; H.R. REP. NO. 95-1487, at 6 (1978). Unlike FOIA's treatment of "agency records," the PRA gives the President "virtually complete control" over "Presidential records" during his term of office. *Armstrong v. Bush*, 924 F.2d at 290; *see also* 44 U.S.C. § 2204(b).[23] And it defines "Presidential records" to include

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2).

There are good reasons to think that WHACS records fall within this definition of "Presidential records." First, those records are "created or received" by the President and his staff, 44 U.S.C. § 2201(2). As we have noted, *see supra* Part III,

---

[23] *Cf.* 44 U.S.C. § 2203(f)(1) ("Upon the conclusion of a President's term of office, . . . the Archivist of the United States shall . . . make [Presidential] records available to the public as rapidly and completely as possible consistent with the provisions of this Act.").

many WAVES and ACR records are arguably "created" by White House staff and White House pass readers on servers physically located in the White House Complex. *See* MOU ¶¶ 4-5; White Decl. ¶¶ 8-10; Nelson Decl. ¶ 3. And the White House "receives" those records from the Secret Service within 30 to 60 days of the visits with which they are associated. *See* MOU ¶ 14. Second, WHACS records are created "in the course of" "the carrying out of the constitutional, statutory, official, [and] ceremonial duties of the President," 44 U.S.C. § 2201(2). They are generated whenever the President consults agency officials, negotiates with foreign heads of state, or speaks with private organizations or individuals at the White House. And they are essential to ensuring that the President can go about these core activities without risking his security or that of his family and staff. WHACS records thus track quite nicely the definition of "Presidential records" found in the PRA.

We are mindful of the fact that Congress did not intend the PRA to diminish the scope of FOIA. *See* 44 U.S.C. § 2201(2)(B) (providing that the "term 'Presidential records' . . . does not include any documentary materials that are . . . official records of an agency (as defined in [5 U.S.C. § 552(e)])"); *see Armstrong v. Exec. Office of the President*, 1 F.3d at 1290, 1292; Bloomberg Br. 7. But that does not make it irrelevant to our analysis. When Congress enacted the PRA in 1978, no case had considered whether materials anything like WHACS records were subject to FOIA. Accordingly, the PRA's definition of "Presidential records" bears on Congress' understanding of the scope of FOIA at the time of the PRA's passage, and hence on the scope of the records it intended to subject to the quite different disclosure regime of the PRA. *Cf. FBI v. Abramson*, 456 U.S. 615, 626 n.8 (1982) (noting that "Congress' definition of 'records'" in the PRA "was helpful to us in determining that an agency must create or obtain a record" before it can be held subject to FOIA).

In sum, the avoidance canon confirms our conclusion that WHACS records do not fall within the scope of FOIA, but are instead subject to the regime established by the PRA.

B

The district court concluded that "the Constitutional avoidance doctrine is not applicable here because the Court is not faced with the interpretation of an ambiguous statute." *Judicial Watch*, 803 F. Supp. 2d at 60. "[E]ven if defendant's concerns about the intrusion on the confidentiality necessary for the President and Vice President to discharge their constitutional duties are valid ones," the court said, "they do not serve as a license for the court to transmute the meaning of an unambiguous statute." *Id.* at 61 (internal quotation marks omitted). But as we noted in Part II.B, the statute is not only ambiguous, it is opaque: Other than excluding records of the Office of the President, the term "agency records" is "defined neither in the Act nor its legislative history." *Tax Analysts*, 492 U.S. at 142. And "[n]either the language of the statute nor the legislative history provides much guidance in fleshing out the meaning of the term." *Bureau of Nat'l Affairs*, 742 F.2d at 1488. Indeed, as we said in *Ryan v. Department of Justice*, "when the requested documents are in the possession of an agency but were created by an entity not defined as an 'agency' under the FOIA[, including] . . . the President's immediate personal staff and units in the Executive Office whose sole function is to advise and assist the President[,] . . . FOIA does not specify a test for determining what is an agency record." 617 F.2d at 784-85.[24]

---

[24]*See also McGehee*, 697 F.2d at 1108 ("[T]he question whether a document in the possession of one agency that originated in another constitutes an 'agency record' for the purposes of the FOIA is not governed by either the terms of the statute, the legislative history or

The district court also thought, and Judicial Watch and its amici argue here, that any separation-of-powers concerns arising from extending FOIA to WHACS records could be mitigated by the Executive's "ready recourse" to FOIA Exemption 5. *Judicial Watch*, 803 F. Supp. 2d at 61; CREW Br. 20; Oral Arg. Recording at 28:00 - 28:40.[25] If such an argument applies in this case, however, it would also have applied in the cases that narrowly construed the coverage of FACA, since FACA likewise authorizes the withholding of records under the FOIA exemptions. *See Public Citizen*, 491 U.S. at 446-47 (citing 5 U.S.C. App. 2 § 10(b)); *In re Cheney*, 406 F.3d at 726. Indeed, this argument would also have applied in *Soucie* and the other cases in which we employed the avoidance canon to hold that FOIA does not cover the records of presidential advisors because to do otherwise would present "serious constitutional questions." *Soucie*, 448 F.2d at 1071-72; *see Judicial Watch v. Dep't of Energy*, 412 F.3d at 132; *Ryan*, 617 F.2d at 788 n.19. But it was not applied in any of those cases.

Of course, there might be little consequence to resolving constitutional concerns by relying on the Executive's assertion of Exemption 5, rather than on the meaning of "agency records," if WHACS records were generally exempt from withholding under that exemption. But Judicial Watch and its amici certainly do not think that is so. In another district court case

---

precedent.").

[25]Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). It incorporates, inter alia, "the presidential communications privilege, the state secrets privilege, and the deliberative process privilege," *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006).

presenting almost the identical question, they argued -- and the court agreed -- that WHACS visitor records do *not* fall within Exemption 5 because they consist only of the names of the visitor, visitee, and date and time of the visit. *CREW*, 592 F. Supp. 2d at 118-19. Although that court said "there may exist some hypothetical situation" in which the exemption would apply, *id.* at 119, Judicial Watch has been hard put to suggest one. At oral argument, for example, it was unwilling to say the exemption would extend to WHACS records revealing visits between Israeli officials and National Security Council personnel who work on issues relating to Iran's nuclear program -- meetings that could be taken to signal discussions about possible military action. *See* Oral Arg. Recording at 36:30 - 44:08.[26]

In any event, there are no decisions of this court that address whether the presidential communications privilege contained in Exemption 5 extends to the names of visitors to the President and his staff. And it seems to us that deciding that question would be at least as difficult -- and present separation-of-powers questions at least as serious -- as deciding the question now before us. We see nothing to be gained by trading one difficult question for another. *Cf. Cheney*, 542 U.S. at 389-90 ("Once executive privilege is asserted, . . . [the] inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. These occasion[s] for constitutional confrontation between the two branches should be avoided whenever possible." (internal quotation marks omitted)).

---

[26]Judicial Watch did suggest that records revealing a visit to the President by (and the identities of) the Navy SEALs who killed Osama bin Laden would be exempt. Oral Arg. Recording at 44:08 - 44:41.

Moreover, even if a significant subset of WHACS records would be protected by Exemption 5, the burden of identifying those records on a document-by-document basis is substantial enough to make that an ineffective way of mitigating the kind of separation-of-powers concerns at issue here. In this case, Judicial Watch's FOIA request covers every visitor record from January through August 2009 -- a total of almost 500,000 records. Droege Decl. ¶ 16. And we cannot be blind to the precedent we would set by holding that those records are covered by FOIA: such a holding would in all likelihood be followed by subsequent requests covering the next four years, and then each month thereafter.[27]

In *Cheney*, the Supreme Court reviewed a discovery order, issued by a district court in a case in which the plaintiffs alleged a violation of FACA, directing the Vice President and other senior officials to produce information about a task force established to give advice to the President. 542 U.S. at 372. Notwithstanding that the district court's order permitted the government to assert privileges to protect individual sensitive documents from disclosure, the Court held that mandamus could be available to block such discovery. The ability of the

---

[27]The burden is particularly great with respect to the records at issue here because many if not most of the personnel with knowledge of the purpose of the January through August 2009 visits no longer work at the White House. *See* Tibbits Decl. ¶¶ 27, 33 (regarding national security staff). The burden going forward is reduced because, under the voluntary disclosure policy adopted by the White House in September 2009, employees who thereafter submit visitor requests must designate visits that are sensitive. *See supra* note 6; Tibbits Decl. ¶¶ 15-16. But flagging a visit as "sensitive" is not the same as deciding whether it is covered by a FOIA exemption, a decision that still imposes a considerable burden on the senior staff of the President and Vice President, who may be the only ones who can make such judgments. *See* Tibbits Decl. ¶¶ 35, 37.

recipients to assert privileges, the Court said, was insufficient to "dismiss[] the[] separation-of-powers concerns" raised by the potential intrusion into "Presidential confidentiality." *Id.* at 382-83. "Given the breadth of the discovery requests," the Court declined to require the government to "bear the burden of invoking executive privilege with sufficient specificity and of making particularized objections." *Id.* at 388 (internal quotation marks omitted). Because the burden at issue here is comparable, a similar determination is warranted.

We therefore find no reason not to, and every reason to, apply the canon of avoiding serious constitutional questions in construing the meaning of "agency records" under FOIA.

C

In sum, two sets of considerations lead us to conclude that WHACS records disclosing visitors to the Office of the President are not "agency records." First, although application of our usual, four-part control test for classifying documents as "agency records" leads to indeterminate results in this case, the modified control test set forth in *United We Stand* is applicable and indicates that WHACS records are not agency records. Second, that judgment is confirmed by application of the canon of constitutional avoidance. In order to avoid substantial separation-of-powers questions, we conclude that Congress did not intend to authorize FOIA requesters to obtain indirectly from the Secret Service information that it had expressly barred requesters from obtaining directly from the President.

Judicial Watch and its amici fear that this case will open the floodgates to White House efforts to circumvent FOIA. *See* Judicial Watch Br. 11; CREW Br. 25. Judicial Watch worries that, "[i]f an MOU is all that was necessary to remove records from the ambit of FOIA, by assigning 'legal custody' away from

the agency, then wide swaths of agency records are subject to removal from agency access." Judicial Watch Br. 11. This is a serious argument, and if such an MOU were all that were necessary -- or if *any* record touching on White House communications were necessarily exempt from FOIA -- there would indeed be cause for serious concern. But that is not our holding.

First, we grant no deference to the MOU's assertion that WHACS records are "at all times Presidential records . . . under the exclusive *legal* custody and control of the White House." MOU ¶ 17-18 (emphasis added). As we have explained, that is an issue we decide de novo. *See supra* Part II.A. Because this case was decided on summary judgment, however, we do accept the MOU's representations as to the way in which both parties have historically regarded and treated the documents. *See id.*

Second, the circumstances that lead us to give effect to the MOU in this case are rare. There are very few instances in which a construction of FOIA would put the President on the horns of a dilemma between surrendering his confidentiality and jeopardizing his safety. It is the presence of this unacceptable choice, comparable to the choice Congress faced in *United We Stand* and *Goland*, that is central to our understanding that the President exercises control over these visitor logs.

Third, and most important, the kind of *information* at issue here is in many ways sui generis. This case involves a category of documents that effectively reproduces a set of records that Congress expressly excluded from FOIA's coverage. We are not confronted with an attempt to protect information that would otherwise be subject to FOIA. Rather, the White House seeks to protect information that would not even arguably be subject to the Act, but for the President's need for Secret Service protection. Again, we regard these circumstances as unique.

V

Finally, we note that there is a subcategory of WHACS records as to which our holding does not apply. There are several offices located on the grounds of the White House Complex, including the Office of Management and Budget (OMB) and the Council on Environmental Quality (CEQ), that this court has held are not part of the President's immediate staff and whose "sole function" is not to "advise and assist the President." Those offices are "agencies" under FOIA, and their records are "agency records" subject to disclosure. *See, e.g.*, *Armstrong v. Exec. Office of the President*, 90 F.3d at 559; *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1263 (D.C. Cir. 1980).[28]

For the reasons discussed in Part III.A, application of the four-part control test to WHACS records that reveal visits to those offices is indeterminate. And because the "burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records,'" *Tax Analysts*, 492 U.S. at 142 n.3, that indeterminacy resolves the matter in

[28]The White House website includes a list of units covered by FOIA. In addition to OMB and the CEQ, the website lists the Office of National Drug Control Policy (ONDCP), the Office of the U.S. Trade Representative (USTR), and the Office of Science Technology Policy (OSTP). OSTP, *FOIA Reading Room*, http://www.whitehouse.gov/administration/eop/ostp/library/compliance/foia; *see Center for Int'l Envtl. Law v. Office of U.S. Trade Representative*, 718 F.3d 899, 904 (D.C. Cir. 2013) (adjudicating a FOIA claim regarding the USTR); *Soucie*, 448 F.2d at 1075 (holding that the Office of Science and Technology, predecessor of OSTP, was covered by FOIA); *see also* 5 U.S.C. § 552(f)(1) (defining "agency" to include "the Executive Office of the President"); H.R. REP. NO. 93-1380, at 232 (Conf. Rep.). *See generally Meyer*, 981 F.2d at 1291-94.

Judicial Watch's favor -- unless special considerations of the kind discussed in Parts III.B and IV counsel otherwise.

For the White House offices that are themselves covered by FOIA, there are no such special considerations. First, although the White House (through the MOU) has asserted control over all WHACS records, including records relating to those offices, it has not asserted control over the information they reveal. To the contrary, the government acknowledges that the records of those offices -- including the calendars of their personnel -- may be obtained by FOIA requests made directly to them. *See* Oral Arg. Recording at 50:50 - 51:17; Gov't Reply Br. at 15-16. Thus, subjecting the WHACS records of those offices to FOIA would not permit a requester to obtain anything it could not obtain directly from the office itself. Second, at oral argument the Secret Service acknowledged that revealing the contents of those calendars would not pose separation-of-powers concerns. *See* Oral Arg. Recording at 53:15 - 53:40. Accordingly, neither of the special considerations that drive our decision to limit the reach of the term "agency records" applies to WHACS records that reveal visitors to offices that are subject to FOIA but happen to be located in the White House Complex.

Nor can we discern any other reason for construing "agency records" not to apply to such records. They plainly do not fall within the coverage of the Presidential Records Act. *See* 44 U.S.C. §§ 2201(2), (2)(B). The Secret Service has not suggested that disclosing WHACS records relating to those offices would undermine its ability to protect the President. *See* Oral Arg. Recording at 54:33 - 54:40. And if disclosing particular records did threaten the President's security, we are confident they would be shielded from disclosure by one or another FOIA exemption. *See, e.g.*, 5 U.S.C. § 552(b)(7)(F) (exempting records compiled for law enforcement purposes whose production "could reasonably be expected to endanger the life

or physical safety of any individual"). Such claims can, if necessary, be raised on remand. The government does maintain that it would be less burdensome for the requesters to get the information directly from the offices themselves, but that too is a contention that can be made to the district court.

At oral argument, the Secret Service raised the possibility that there may be some visitors whose appointments are with FOIA-subject agencies, but who later walk over to the White House Office and meet with the President or his staff. *See* Oral Arg. Recording at 57:21 - 57:38. Perhaps so. But we have received no indication that WHACS records for such visitors would reveal that they had meetings anywhere other than at the locations of their scheduled visits. *See* MOU ¶ 4 (stating that the records disclose "the time and location of the planned visit" and "the actual time and place of the visitor's entry into and exit from the White House Complex"). To the extent the records would reveal such exempt information, we agree that they are not agency records. *Cf. United We Stand*, 359 F.3d at 603-04 (holding that portions of agency records may be redacted as non-agency records). But it is impossible at this point to determine whether any records might be subject to withholding on this basis. We leave it to the district court to make that determination in the first instance, aided as necessary by affidavits and further factual development.

VI

Because FOIA contains no definition of "agency records," and because application of our standard four-part test is indeterminate, this is a difficult case. The opinion of the district court, and the briefs of Judicial Watch and its amici, contain serious and substantial arguments in support of that court's holding. But Congress did make clear that it intended to place documents like the President's appointment calendar beyond the

reach of FOIA. Construing the statutory text in light of both that intent and the canon of avoiding constitutional separation-of-powers concerns, we hold that WHACS records that disclose the kind of information contained in such documents are not agency records within the meaning of FOIA. At bottom, we do not believe Congress intended that FOIA requesters be able to obtain from the gatekeepers of the White House what they are unable to obtain from its occupants.

We reiterate that our disposition is narrower than that sought by the Secret Service in two important respects. We do not attach any legal significance, beyond its factual descriptions, to the 2006 MOU between the Secret Service and the White House. Further, we hold that, subject to any applicable exemptions, the Secret Service may not withhold WHACS records that reveal visitors to those offices within the White House Complex that are themselves subject to FOIA. Those documents are "agency records."

The judgment of the district court is reversed as to those WHACS records that would disclose visitors to the Office of the President. It is affirmed as to those that would disclose visitors to offices in the White House Complex that are covered by FOIA. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*