# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 17, 2016          Decided May 13, 2016

No. 15-5183

AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL
LIBERTIES UNION FOUNDATION,
APPELLANTS

v.

CENTRAL INTELLIGENCE AGENCY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01870)

———

*Hina Shamsi* argued the cause for appellants. With her on the briefs was *Arthur B. Spitzer.*

*Susanne Peticolas* was on the brief for *amicus curiae* Senator John D. Rockefeller IV in support of appellants.

*Thomas G. Pulham*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Douglas N. Letter* and *Matthew M. Collette*, Attorneys.

Before: TATEL and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The Freedom of Information Act ("FOIA" or "Act"), subject to certain statutory exemptions, requires federal agencies to make agency records available to the public upon reasonable request. 5 U.S.C. § 552(a)(3)(A); *see id.* § 552(b)(1)-(9). Congress is not an "agency" under FOIA and, therefore, congressional documents are not subject to FOIA's disclosure requirements. *See id.* §§ 551(1)(A), 552(f). When Congress creates a document and then shares it with a federal agency, the document does not become an "agency record" subject to disclosure under FOIA if "Congress [has] manifested a clear intent to control the document." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 221 (D.C. Cir. 2013) (quoting *United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 597 (D.C. Cir. 2004)).

The dispute in this case concerns an attempt by the American Civil Liberties Union and American Civil Liberties Union Foundation (jointly, "Appellants") to invoke FOIA to obtain a copy of a report authored by the Senate Select Committee on Intelligence ("Committee"). In 2009, as a part of its oversight of the intelligence community, the Senate Committee announced that it would conduct a comprehensive review of the program of detention and interrogation formerly run by the Central Intelligence Agency ("CIA"). Before the review commenced, the Senate Committee and officials at the CIA negotiated arrangements to deal with access to classified materials by Senators and their staff, and agreed on rules regarding the Committee's control over its work product.

These arrangements and rules were memorialized in a June 2, 2009, letter ("June 2009 Letter") sent by the Chairman and Vice Chairman of the Senate Committee to the CIA Director, which provided, *inter alia*, that

> Any . . . notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee . . . . These documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee. As such, these records are not CIA records under the Freedom of Information Act or any other law.

In 2014, after completing its review and receiving comments and proposed edits from the Executive Branch, the Committee produced a *Committee Study of the CIA's Detention and Interrogation Program*. The end product included a 6,000-plus page investigative report ("Full Report") and a 500-plus page Executive Summary. The Committee transmitted copies of the final Full Report and Executive Summary to the President, as well as to officials at the CIA, Department of Defense, Department of Justice, and Department of State (collectively, "Appellees"). The Executive Summary, but not the Full Report, was publicly released by the Committee. The Committee made it clear that it alone would decide if and when to publicly release the Full Report. Appellants filed FOIA requests with Appellees seeking disclosure of the Full Report. These requests were denied on the ground that the Full Report is a congressionally generated and controlled document that is not subject to disclosure under FOIA. Appellants filed suit in the District Court to compel disclosure, but their action was dismissed by

the court for lack of jurisdiction. Appellants now appeal the decision of the District Court. We affirm.

Appellants' principal claim is that the Senate Committee relinquished control over the Full Report when it sent the document to the President and officials at the Appellees' agencies in December 2014. According to Appellants, when an agency has been given possession of a document created by Congress, the document is presumptively an agency record unless Congress has clearly expressed its intent to control the document. In Appellants' view, Appellees cannot establish a clear assertion of congressional control with respect to the Full Report because it was disseminated to Appellees without any restrictions. We disagree. The June 2009 Letter manifests a clear intent by the Senate Committee to maintain continuous control over its work product, which includes the Full Report. Therefore, the Full Report always has been a congressional document subject to the control of the Senate Committee. The mere transmission of the Full Report to agency officials for their consideration and use within the Executive Branch did not vitiate the command of the June 2009 Letter or constitute congressional relinquishment of control over the document.

## I. BACKGROUND

### A. The Senate Committee's Oversight Review and Production of the Full Report

In March 2009, the Senate Select Committee on Intelligence announced that it would conduct an oversight review of the CIA's highly controversial, but then-defunct, detention and interrogation program. The review contemplated by the Committee could not be completed unless Senators and their staff had access to millions of pages of CIA documents containing highly sensitive and classified

information. Because of the concerns regarding classified materials, the members of the Committee and officials at the CIA negotiated special arrangements to allow the Senate Committee to undertake a comprehensive review while respecting the President's constitutional authorities over classified information. These arrangements were memorialized in the aforementioned June 2, 2009, letter from the Senate Committee Chairman and Vice Chairman to the CIA Director, setting forth "procedures and understandings" governing the Senate Committee's review.

The letter indicated that the Senate Committee would conduct its review of CIA records in a secure electronic reading room at a CIA facility. The CIA agreed to create a segregated network drive at the CIA facility where Senate personnel could prepare and store their work product. And, at the insistence of the Senate Committee, the letter also included clear terms regarding control of the Senate Committee's work product. On this point, the letter stated:

> Any documents generated on the network drive referenced in paragraph 5, as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee and will be kept at the Reading Room solely for secure safekeeping and ease of reference. These documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee. As such, these records are not CIA records under the Freedom of Information Act or any other law. . . . If the CIA receives any request or demand for access to these records from outside the CIA under the Freedom of Information Act or any other authority, the

CIA will immediately notify the Committee and will respond to the request or demand based upon the understanding that these are congressional, not CIA, records.

Letter from Dianne Feinstein, Chairman, Senate Select Comm. on Intelligence, and Christopher S. Bond, Vice Chairman, Senate Select Comm. on Intelligence, to Leon Panetta, Director, CIA (June 2, 2009) ("June 2009 Letter"), at ¶ 6, Joint Appendix ("J.A.") 93-94. Pursuant to the terms of the June 2009 Letter, the Senate Committee drafted initial versions of its report on the CIA's segregated network drive. As the drafting process progressed, however, the Senate Committee worked with the CIA to transfer portions of the report from the segregated network drive to the Senate Committee's secure facilities at the United States Capitol. This arrangement allowed the Senate Committee to complete the drafting process in its own workspace.

On December 13, 2012, the Senate Committee approved the initial draft of the *Committee Study of the CIA's Detention and Interrogation Program*. This version of the Committee's work included drafts of the 6,000-plus page Full Report and the 500-plus page Executive Summary. The Senate Committee sent the drafts to an approved list of individuals in the Executive Branch for the limited purpose of eliciting their comments and proposed edits.

On April 3, 2014, after revising the drafts in response to the feedback received from the Executive Branch, the Senate Committee voted to approve updated versions of the Full Report and the Executive Summary. The Committee then voted to send only the updated Executive Summary to the President for declassification review. Over the next several months, the Senate Committee and the Executive Branch

engaged in further discussions regarding the processing of the Executive Summary. The Senate Committee also continued to edit both the Executive Summary and the Full Report. On December 9, 2014, after the Director of National Intelligence declassified a minimally redacted version of the Executive Summary, the Senate Committee publicly released that document. The Chairman's Foreword to the Executive Summary noted that the Full Report was final, but that the Senate Committee was not publicly releasing the Full Report.

In the days following the public release of the Executive Summary, the Senate Committee sent copies of the Full Report to the President, as well as to specified officials at the CIA, Department of Defense, Department of Justice, and Department of State, *i.e.*, the Appellees in this case. The Senate Committee's transmission of the Full Report to the President included a letter from Senate Committee Chairman Dianne Feinstein. The letter, dated December 10, 2014, stated that

> the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated. To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit.

Letter from Dianne Feinstein, Chairman, Senate Select Comm. on Intelligence, to President Barack Obama (Dec. 10, 2014) ("December 2014 Letter"), J.A. 133.

In January 2015, the Chairmanship of the Senate Committee passed from Senator Feinstein to Senator Richard

Burr. On January 14, 2015, Senator Burr sent a letter to the President saying that he considered the Full Report to be "a highly classified and committee sensitive document," and he requested that "all copies of the full and final report in the possession of the Executive Branch be returned immediately to the Committee." Letter from Richard Burr, Chairman, Senate Select Comm. on Intelligence, to President Barack Obama (Jan. 14, 2015), J.A. 136. Senator Feinstein, who was then Vice Chairman of the Committee, disagreed with Senator Burr, and she "ask[ed] that [the President] retain the full 6,963-page classified report within appropriate Executive branch systems of record, with access to appropriately cleared individuals with a need to know." Letter from Dianne Feinstein, Vice Chairman, Senate Select Comm. on Intelligence, to President Barack Obama (Jan. 16, 2015), J.A. 139. We are unaware of any further correspondence on the matter.

**B. Appellants' FOIA Requests and Initiation of this Lawsuit**

In February 2013, Appellants filed a FOIA request with the CIA seeking "disclosure of the recently adopted [Senate Committee] report . . . relating to the CIA's post-9/11 program of rendition, detention, and interrogation." The CIA promptly denied the request, characterizing the then-initial draft version of the Full Report as a "Congressionally generated and controlled document that is not subject to the FOIA's access provisions."

Appellants filed suit against the CIA in November 2013, seeking to compel disclosure of the Full Report. Several months later, Appellants submitted new FOIA requests to the other Appellee agencies, seeking the Full Report as it existed when the Committee voted to send the Executive Summary to

the President for declassification review. Appellants then filed an amended complaint with the District Court based on these new requests and added the other agencies as defendants in the lawsuit. The parties and the District Court then agreed that Appellants' amended complaint referred to the Full Report that was transmitted to Appellees after the Executive Summary was released.

In January 2015, Appellees moved to dismiss Appellants' suit under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, contending that the Full Report is a congressional record beyond the reach of FOIA. Appellants opposed the motion, arguing that the Full Report became an "agency record" subject to disclosure when it was transmitted from the Senate Committee to Appellees in December 2014. The District Court granted Appellees' motion to dismiss, and Appellants now appeal.

## II.  ANALYSIS

We review *de novo* the District Court's grant of Appellees' motion to dismiss for lack of subject matter jurisdiction. *See Judicial Watch, Inc. v. U.S. Senate*, 432 F.3d 359, 360 (D.C. Cir. 2005). For the reasons explained below, we affirm the eminently well-reasoned judgment of the District Court.

### A.  The Legal Framework

As noted above, subject to certain statutory exemptions, FOIA requires federal agencies to make agency records available to the public upon reasonable request. 5 U.S.C. § 552(a)(3)(A); *see id.* § 552(b)(1)-(9). The Act grants federal district courts jurisdiction "to order the production of any *agency records* improperly withheld from the complainant."

*Id.* § 552(a)(4)(B) (emphasis added). FOIA limits access to "agency records," but the statute does not define the term. *Forsham v. Harris*, 445 U.S. 169, 178 (1980); *Judicial Watch*, 726 F.3d at 215-16. Nevertheless, because it is undisputed that Congress is not an agency, it is also undisputed that "congressional documents are not subject to FOIA's disclosure requirements." *United We Stand*, 359 F.3d at 597 (citing 5 U.S.C. §§ 551(1), 552(f)).

The issue in this case is whether the Senate Committee's Full Report became an "agency record" subject to disclosure under FOIA when it was transmitted from Congress to the Executive Branch. In other words, did the Full Report achieve the status of an "agency record" once it was in the possession of Appellees, *i.e.*, federal agencies, who are subject to FOIA?

It is clear that "not all documents in the possession of a FOIA-covered agency are 'agency records' for the purpose of that Act." *Judicial Watch*, 726 F.3d at 216. In *United States Department of Justice v. Tax Analysts*, the Supreme Court instructed that the term "agency records" extends only to those documents that an agency both (1) "create[s] or obtain[s]," *and* (2) "control[s] . . . at the time the FOIA request is made." *Tax Analysts*, 492 U.S. 136, 144-45 (1989) (citation omitted). Thus, not all records that an agency possesses are "agency records" under FOIA. *See, e.g.*, *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 157-58 (1980) (summaries of Henry Kissinger's telephone conversations as National Security Advisor that he brought from the White House to the State Department); *Goland v. CIA*, 607 F.2d 339, 344-48 (D.C. Cir. 1978) (congressional hearing transcript in the possession of the CIA), *vacated in part on other grounds*, 607 F.2d 367 (D.C. Cir. 1979) (per curiam). In this case, there is no dispute that Appellees lawfully obtained copies of the Full Report, thus

satisfying the first prong of *Tax Analysts*. The critical question before the court is whether the Senate Committee continued to "control" the Full Report once copies were transmitted to the Executive Branch.

Normally, we look to four factors to determine whether an agency has sufficient control over a document to make it an "agency record":

> [1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

*Judicial Watch*, 726 F.3d at 218 (alterations in original) (quoting *Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1068-69 (D.C. Cir. 1988), *aff'd*, 492 U.S. 136 (1989)). However, this "test does not apply to documents that an agency has either obtained from, or prepared in response to a request from, a governmental entity not covered by FOIA: the United States Congress." *Id.* at 221. This is because "special policy considerations . . . counsel in favor of according due deference to Congress' affirmatively expressed intent to control its own documents." *Id.* (ellipsis in original) (quoting *Paisley v. CIA*, 712 F.2d 686, 693 n.30 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984) (per curiam)). Thus, when an agency possesses a document that it has obtained from Congress, the answer to the question whether the document is an "agency record" subject to disclosure under FOIA "'turns on whether Congress manifested a clear intent to control the document.' This focus

renders the first two factors of the standard test effectively dispositive." *Id.* (quoting *United We Stand*, 359 F.3d at 596).

These principles arise from a series of decisions issued by this court, beginning with *Goland v. CIA*. In that case, a FOIA requester sought disclosure of a congressional hearing transcript that had been released by a congressional committee to the CIA. *Goland*, 607 F.2d at 342-43. The court concluded that the transcript, which "bore the typewritten marking 'Secret' on its interior cover page," was retained by the CIA "for internal reference purposes only." *Id.* at 347. The court explained that "Congress exercises oversight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in according with Congress' originating intent." *Id.* at 346. Subjecting the transcript to disclosure under FOIA, we said, would force Congress "either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role." *Id.* In light of the "circumstances attending the document's generation and the conditions attached to its possession," the court held that the CIA was "not free to dispose of the Transcript as it wills, but holds the document, as it were, as a 'trustee' for Congress." *Id.* at 347. Because "on all the facts of the case Congress' intent to retain control of the document [wa]s clear," we ruled that the transcript was "not an 'agency record' but a congressional document to which FOIA does not apply." *Id.* at 348.

The *Goland* analysis was followed in later cases, some of which found that the contested documents were subject to disclosure under FOIA "because Congress had not clearly expressed an intent to retain control over them." *Judicial Watch*, 726 F.3d at 221. For example, in *Holy Spirit Ass'n for the Unification of World Christianity v. CIA*, a FOIA

requester sought documents that had come into the possession of the CIA containing "correspondence and memoranda originated by one of four congressional committees that investigated various aspects of Korean-American relations between 1976 and 1978." *Holy Spirit*, 636 F.2d 838, 839-840 (D.C. Cir. 1980), *vacated in part on other grounds*, 455 U.S. 997 (1982). Because the documents were released to the CIA by Congress without "some clear assertion of congressional control. . . . either in the circumstances of the documents' creation or in the conditions under which they were sent to the CIA," the court determined that they were agency records under FOIA. *Id.* at 842. The court contrasted the treatment of the requested records with the treatment of "three sealed cartons of additional congressional documents" transferred to the CIA at around the same time that were "accompanied by a memorandum from the House Committee on International Relations indicating that the Committee retained jurisdiction over the documents, that the documents contained classified information, and that access to the files was limited to those with authorization from the Clerk of the House." *Id.*

The decision in *Paisley v. CIA* is also illuminating. In that case, a FOIA requester sought disclosure of letters transmitted from the Senate Committee to the FBI and CIA relating to the shooting death of a former CIA official. *Paisley*, 712 F.2d at 689-90, 694. In concluding that the letters were agency records, the court noted that "[w]hen Congress created the five documents in this case, it affixed no external indicia of control or confidentiality on the faces of the documents." *Id.* at 694. We contrasted the letters with "at least seven *other* of [the Senate Committee's] documents . . . which were later requested by appellant, but which were properly held by the District Court to be exempt congressional documents in light of their classification markings." *Id.* The court stressed that the disputed letters were subject to disclosure under FOIA

because they were not "sent to the FBI and the CIA in such a way as to manifest any intent by Congress to retain control." *Id.* In other words, "nothing in either the circumstances of the documents' creation or the conditions attending their transfer provide[d] the requisite express indication of a congressional intent to maintain exclusive control over these particular records." *Id.* at 695.

It is important to note that the decisions in *Goland*, *Holy Spirit*, and *Paisley* make it clear that Congress may manifest an intent to retain control over documents *either* when the documents are created *or* when the documents are transmitted to an agency. Obviously, then, if Congress initiates the creation of documents with a clear statement that the "*documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee*," June 2009 Letter, at ¶ 6, J.A. 93, and adds that "*these records are not CIA records under the Freedom of Information Act or any other law*," *id.*, then congressional intent to maintain exclusive control of the documents is clear. In this situation, congressional intent can only be overcome if the record reveals that Congress subsequently acted to vitiate the intent to maintain exclusive control over the documents that was manifested at the time of the documents' creation.

In sum, if "Congress has manifested its own intent to retain control, then the agency—by definition—cannot lawfully 'control' the documents." *Paisley*, 712 F.2d at 693. Conversely, if Congress intends to relinquish its control over documents, then the agency may use them as the agency sees fit. *See id.*; *see also United We Stand*, 359 F.3d at 600 ("Congress's intent to control and the agency's ability to control 'fit together in standing for the general proposition that the agency to whom the FOIA request is directed must

have exclusive control of the disputed documents' . . . ." (quoting *Paisley*, 712 F.2d at 693)). In this case, we must decide whether Congress somehow vitiated its clear intent to control the Full Report when it transmitted the document to Appellees.

Before turning to an application of the law to the facts of this case, we must make it clear that we can give no weight to the letter sent by now-Senate Committee Chairman Richard Burr to the President in January 2015. The letter was sent after Appellants had submitted their FOIA request and after they had filed suit in the District Court. Therefore, the letter is a "post-hoc objection[] to disclosure," and, as such, it "cannot manifest the clear assertion of congressional control that our case law requires." *United We Stand*, 359 F.3d at 602; *see also Holy Spirit*, 636 F.2d at 842 (refusing to consider as evidence of congressional intent a letter "written as a result of [appellant's] FOIA request and this litigation—long after the actual transfer [of the documents] to the CIA").

## B. Application of the Law to the Facts of this Case

As we have made clear, the critical evidence in this case is the June 2009 Letter from the Senate Committee Chairman and Vice Chairman to the Director of the CIA. The Letter, in straightforward terms, makes it plain that the Senate Committee intended to control any and all of its work product, including the Full Report, emanating from its oversight investigation of the CIA. The Letter's command is unequivocal, and it contains no temporal limitations:

> Any documents generated on the network drive referenced in paragraph 5, *as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or*

> *Members*, are the property of the Committee and will be kept at the Reading Room solely for secure safekeeping and ease of reference. *These documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee.* As such, these records are not CIA records under the Freedom of Information Act or any other law. . . . If the CIA receives any request or demand for access to these records from outside the CIA under the Freedom of Information Act or any other authority, the CIA will immediately notify the Committee and will respond to the request or demand based upon the understanding that these are congressional, not CIA, records.

June 2009 Letter, at ¶ 6, J.A. 93-94 (emphases added).

Appellants maintain that the June 2009 Letter demonstrates the Senate Committee's intent to control only those documents that were either (1) stored on the CIA's segregated network drive or (2) otherwise kept at the CIA's Reading Room. Br. for Appellants at 26. Therefore, according to Appellants, the Full Report was not covered by the Committee's expressed intention to control its work product. We reject this argument because it cannot be squared with the plain language of the Letter.

The Letter, by its explicit terms, applies to all "documents generated on the network drive" *and* to "any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members." The Full Report is a "final . . . report." Therefore, the language of the Letter unambiguously includes the Full Report. It does not matter that the Full Report was neither

stored on the CIA's segregated network drive nor kept in the CIA's Reading Room. Indeed, it was understood by the Committee and the CIA that much of the final drafting of the reports would be completed at the United States Capitol in the Senate Committee's own workspace. The Full Report and the other specified documents were to "remain congressional records in their entirety . . . even after the completion of the Committee's review." The Letter's expansive language is clear on this point.

At oral argument, counsel for Appellants cited *United We Stand* for the proposition that "this court's case law is skeptical about pre-existing agreements" that foreclose agencies from disclosing documents that are in their possession. Oral Arg. Recording at 11:02-11:11. This argument stretches the holding of *United We Stand* well beyond what the court said in that case. We simply rejected the agency's effort to rely on its "consistent course of dealing" with Congress to prove that future communications were necessarily confidential. *United We Stand*, 359 F.3d at 602; *see also Paisley*, 712 F.2d at 695 (letters indicating Senate Committee's "desire to prevent release without its approval of any documents generated by the Committee or an intelligence agency in response to a Committee inquiry [were] . . . . too general and sweeping to provide sufficient proof, when standing alone . . . . [of] the requisite express indication of a congressional intent to maintain exclusive control over the[] particular records [at issue]"). In this case, however, unlike in *United We Stand*, the June 2009 Letter did not relate to the Senate Committee's previous course of dealing with the CIA. Rather, the Letter related specifically to the work product emanating from the Senate Committee's review of the CIA's former detention and interrogation program. The Full Report was indisputably part of this work product. The June 2009 Letter is thus akin to the typewritten marking "Secret"

on the interior cover page of the document at issue in *Goland*. The Committee effectively stamped its control over the Full Report when it wrote the terms of the Letter.

The June 2009 Letter also stands in sharp contrast to the evidence in *Paisley*. It surely cannot be said here that the June 2009 Letter was "too general and sweeping" to manifest the Committee's clear intent to control the work product emanating from the Senate Committee inquiry. *See also Judicial Watch*, 726 F.3d at 223 & n.20 (relying on a pre-existing agreement, likewise concluding that such agreement was not too "general"). The Senate Committee could hardly have been more clear or precise in claiming control over all of the work produced during its investigation of the CIA's former detention and interrogation program.

In an effort to avoid the clear terms of the June 2009 Letter, Appellants argue that the circumstances surrounding the transmittal of the Full Report to Appellees demonstrate that the Senate Committee intended to relinquish its control over the Full Report. We disagree because the Committee's limited transmittal of the Full Report – *especially in contrast with its public release of the Executive Summary* – in no way vitiated its existing, clearly expressed intent to control the Full Report.

Appellants' argument seems to be premised on an assumption that, when Congress transmits documents to an agency, it must give contemporaneous instructions preserving any previous expressions of intent to control the documents in order to retain control over the documents. This is not the law. Indeed, we rejected this proposition in *Holy Spirit*, even as we held that the relevant documents constituted agency records. *See Holy Spirit*, 636 F.2d at 842 (emphasizing that "we do not adopt appellant's position—that Congress must give

contemporaneous instructions when forwarding congressional records to an agency. Nor do we direct Congress to act in a particular way in order to preserve its FOIA exemption for transferred documents"). And in *Judicial Watch*, the court relied heavily on a Memorandum of Understanding executed "well before the creation and transfer of the documents at issue" in that case. *See Judicial Watch*, 726 F.3d at 223 n.20. The court in *Judicial Watch* did not require the Office of the President – the FOIA exempt governmental entity in that case – to show contemporaneous evidence confirming its previous expressions of intent to control the disputed documents.

Appellants acknowledge that when the Senate Committee approved an initial version of the Full Report in December 2012 and sent the draft to the Executive Branch, the Senate Committee did so with specific limitations on its use. The Committee's transmission made it clear that the draft of the Full Report was being sent to specific individuals in the Executive Branch for comments and possible edits, and that the Senate Committee retained the discretion to accept or reject any proposed changes offered by the Executive Branch. The Senate Committee's transmission also emphasized that the Committee alone would "consider how to handle any public release of the report, in full or otherwise." Letter from Dianne Feinstein, Chairman, Senate Select Comm. on Intelligence, to President Barack Obama (Dec. 14, 2012), J.A. 127. These actions undeniably reinforced what had already been made clear in the June 2009 Letter, *i.e.*, that the Committee intended to retain control over the Full Report.

Appellants contend, however, that when the Senate Committee transmitted the final version of the Full Report to the Executive Branch in December 2014, the Committee did so without any similar limitations attached. This, according to Appellants, gives proof of Congress' intent to abdicate control

over the Full Report. In further support of this position, Appellants seize on the following language of the December 2014 Letter, which accompanied the Senate Committee's transmission of the final version of the Full Report to the President:

> "[T]he full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated. To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit."

December 2014 Letter, J.A. 133.

Focusing on the letter's use of the terms "broadly" and "as you see fit," Appellants claim that the Senate Committee relinquished any control it may have had over the Full Report. Br. for Appellants at 28-29. When the December 2014 Letter is read in context, however – particularly against the backdrop of the June 2009 Letter – it does not vitiate Congress' existing, clearly expressed intent to maintain control of the Full Report. The December 2014 Letter undoubtedly gives the Executive Branch some discretion to use the Full Report for internal purposes, much like the transcript at issue in *Goland*. *See Goland*, 607 F.2d at 347 (transcript was a congressional document even though "[t]he CIA retain[ed] a copy . . . for internal reference purposes"). However, the December 2014 Letter does not override the Senate Committee's clear intent to maintain control of the Full Report expressed in the June 2009 Letter.

When Senator Feinstein transmitted the draft of the Full Report to the Executive Branch on December 14, 2012, her transmittal letter made it clear that the Committee would determine if and when to publicly disseminate the Full Report. Nothing changed as the final edits and corrections were made to the Full Report. The limited transmittal of the Full Report to Appellees in 2014 certainly did not vitiate the command of the June 2009 Letter or otherwise authorize public dissemination.

Finally, Appellants claim that the Chairman's Foreword to the Executive Summary, which encouraged "[t]his and future Administrations [to] use this Study to guide future programs, correct past mistakes, [and] increase oversight of CIA representations to policymakers," is evidence of the Committee's intent to relinquish control of the Full Report. Br. for Appellants at 29. This argument, which relies on a glaring *non sequitur*, obviously cannot carry the day.

On the record before us, the Senate Committee's intent to retain control of the Full Report is clear. The Full Report therefore remains a congressional document that is not subject to disclosure under FOIA.

## III. CONCLUSION

For the foregoing reasons, the judgment of the District Court is affirmed.

*So ordered.*